1   Ashwin J. Ram (SBN 277513)
    aram@steptoe.com
2   Sonja Arndt (SBN 322728)
    sarndtjohnson@steptoe.com
3   STEPTOE LLP
    633 West Fifth Street, Suite 1900
4   Los Angeles, CA 90071
    Telephone: (213) 439-9400
5   Facsimile: (213) 439-9599

6   *Attorneys for Defendant*
    *IGNITE INTERNATIONAL BRANDS, LTD.*
7
    Reuben C. Cahn (SBN 255158)
8   rcahn@bklwlaw.com
    BIENERT KATZMAN LITTRELL WILLIAMS LLP
9   360 E. 2nd St., Suite 625
    Los Angeles, CA 90012
10  Telephone: (949) 369-3700

11  *Attorney for Defendant*
    *SCOTT ROHLEDER*
12

13                  **UNITED STATES DISTRICT COURT**

14              **FOR THE CENTRAL DISTRICT OF CALIFORNIA**

15

16  UNITED STATES OF AMERICA,          Case No.: 2:24-cr-00569-MEMF

17             Plaintiff,              Hon. Maame Ewusi-Mensah Frimpong

18        v.                           **DEFENDANTS IGNITE AND ROHLEDER'S MOTION TO DISMISS COUNTS ONE THROUGH SIX OF THE INDICTMENT**
    IGNITE INTERNATIONAL BRANDS,
19  LTD, et al.,

20             Defendants.
                                       Indictment Date:   Sept. 26, 2024
21                                     Trial Date:        May 19, 2025

22

23

24

25

26

27

28

---
DEFENDANTS IGNITE AND ROHLEDER'S MOTION TO DISMISS COUNTS ONE
THROUGH SIX OF THE INDICTMENT

**INTRODUCTION**

Pursuant to Federal Rule of Criminal Procedure 12(b), Defendants Ignite International Brands, Ltd. ("Ignite") and Scott Rohleder ("Rohleder"), respectfully move the Court to dismiss all Counts in the Indictment against Ignite and Rohleder—that is, Counts One through Six.  Count One alleges a conspiracy by all Defendants to impede the SEC from collecting a 1993 disgorgement judgment against Defendant Paul Bilzerian.  Counts Two through Six (referred to collectively as the "3PL Counts") allege conspiracy to commit wire fraud and securities fraud in connection with sales that Ignite made to its then-master distributor.  As shown below, the Court can and should "determine without a trial on the merits" (Fed. R. Crim. P. 12(b)(1)) that Counts One through Six fail as a matter of law and must be dismissed.

As noted, Count One alleges a conspiracy to impede the SEC from collecting a 1993 disgorgement judgment against Defendant Paul Bilzerian based on the purported concealment of Bilzerian's (non-existent) beneficial ownership and funding of Ignite.  This Count fails as a matter of law for three independent reasons: (1) the underlying disgorgement judgment is unlawful and unconstitutional, meaning that the government's desire to collect that judgment is not a "legitimate official action"; (2) the Indictment contains no allegation that Ignite (or any other Defendant besides Bilzerian himself) was even aware that the SEC judgment *existed*, much less that they knew of and conspired to advance Bilzerian's alleged scheme to prevent the SEC from collecting; and (3) there was no duty for Bilzerian—let alone Ignite—to report any purported ownership or investment on Bilzerian's part with respect to Ignite, and therefore, that cannot be the basis for an actionable *Klein* conspiracy.

*First*, Count One requires the government to allege and prove that Defendants conspired to impede a "legitimate official action and purpose."  *Hammerschmidt v. United States*, 265 U.S. 182, 188 (1924); *see also* 18 U.S.C. § 371; *United States v. Rodman*, 776 F.3d 638, 642 (9th Cir. 2015) ("any conspiracy for the purpose of impairing, obstructing[,] or defeating the lawful function of any department of Government").  Here, the alleged "official action" is the SEC's collection of its 1993 judgment.  But that is not a "legitimate" (or "lawful") government action, because the judgment itself is unlawful.  To the contrary, it was a duplicative punitive judgment that, coming on top of

2

1  Bilzerian's criminal conviction and sentence for the same alleged conduct, violated the Double

2  Jeopardy Clause, not to mention the constraints on SEC disgorgement authority recognized in

3  authoritative decisions such as *Liu v. SEC*, 591 U.S. 71 (2020).

4      *Second*, a conspiracy charge requires allegations that Defendants entered into an agreement

5  to pursue an illegitimate objective, which in turn necessarily requires knowledge of that objective.

6  Yet there is no allegation that Ignite, Rohleder, or anyone other than Paul Bilzerian alone was even

7  aware of the 1993 disgorgement order, much less that they knew that (1) Bilzerian had not satisfied

8  the judgment (or what amount was still outstanding); (2) there was an open court case in which the

9  SEC could still seek to enforce the judgment; (3) Bilzerian had made statements to the SEC

10  concerning his personal assets; or (4) Bilzerian allegedly concealed assets in those statements.

11  Indeed, the *only* communication with the SEC during the period of the alleged conspiracy is a

12  July 15, 2019 email to an SEC litigator in which Bilzerian refers to events that occurred prior to

13  2016: "As you know, I have filed bankruptcy twice and a receiver confiscated and liquated all my

14  assets, including my wages. . . ."  Indictment ¶ D.4, Overt Act No. 5.

15      In effect, and *third*, the Indictment attempts to deputize Ignite and Rohleder by charging

16  them, on pain of criminal punishment, with a duty to promote the SEC's collection of a debt where

17  neither Ignite nor Rohleder had any legal obligation to play that role—and no alleged basis to know

18  facts that would have *allowed* them to play that role.  The Indictment is bereft of allegations that

19  anyone apart from Bilzerian obscured any funds from the SEC, but merely contains conclusory

20  (and demonstrably incorrect) allegations that funds invested into Ignite were, in fact, Paul

21  Bilzerian's funds.  Though the record and the government's discovery contain no substantiation of

22  that allegation, there is no need here to debate the fact, because, as a matter of law, Ignite had no

23  duty to report on another individual's purported assets and therefore cannot be liable for failing to

24  perform such a duty.

25      As for Counts Two through Six, the government's continued pursuit of those 3PL Counts

26  contravenes the Due Process Clause and entails a substantial violation of the disclosure

27  requirement of *Brady v. Maryland*, 373 U.S. 83 (1963).  These Counts are all based on false

28  information provided to the government by its key witness and are, quite simply, incorrect.  Ignite

DEFENDANTS IGNITE AND ROHLEDER'S MOTION TO DISMISS COUNTS ONE
THROUGH SIX OF THE INDICTMENT

has now exposed the true facts underlying Ignite's relationship with its erstwhile master distributor, and the government now has specific knowledge and evidence objectively demonstrating that the 3PL Counts are factually baseless. Nevertheless, the government has thus far refused to dismiss these counts—or to produce discovery reflecting the government's recent reassessment of its key witness's candor and credibility. The 3PL Counts must be dismissed.

## ARGUMENT

## I.      COUNT ONE MUST BE DISMISSED

### A.      The DOJ and SEC Cases Against Bilzerian Involved No Proof of Harm

In the 1980s, Bilzerian concluded that Cluett and Hammermill stocks were undervalued and engineered tender offers for both companies. After Bilzerian announced his all-cash tender offers—for substantially more than their historical stock prices—"white knight" corporations purchased the target companies, generating significant profits for both rank-and-file stockholders and Bilzerian alike. *See SEC v. Bilzerian*, 814 F. Supp. 116, 118-20 (D.D.C. 1993).[1]

In 1988, federal prosecutors indicted Bilzerian for securities law violations. *See* Ex. 1, 1988 Indictment, *United States v. Bilzerian*, 88-CR-00962-RJW-1 (S.D.N.Y. Dec. 21, 1988), Dkt. 1. Although the 1988 indictment alleged a variety of technical violations associated with Bilzerian's Schedule 13D and 14D-1 SEC filings, it alleged no cognizable or compensable harm to any purported "victim." This is unsurprising: The transaction was a success and profitable to investors; there was no proven harm to victims at all. While Bilzerian's tender offers were themselves both profitable and legal, Bilzerian was convicted of violating SEC disclosure rules while conducting those transactions.

In relevant part, the government charged that Bilzerian:

- failed to disclose the identities of his fellow investors, instead identifying only himself as the source of funds for his investments in the companies (1988 Ind. ¶¶ 1-2, ¶¶ 7-10, ¶¶ 23-24, ¶¶ 48-49, ¶¶ 54-57, ¶¶ 64-65);

- failed to disclose that he had temporarily "parked" shares of each company with a broker, allowing him to continue assembling shares for a few additional days before disclosing his

---

[1] In considering a Rule 12(b) motion to dismiss an indictment, the Court may of course take judicial notice of "[m]aterials from a proceeding in another tribunal." *United States v. Hampton*, 2024 WL 1973341, at *3 (D. Alaska 2024); *see* Fed. R. Evid. 201; *MGIC Indem. Corp. v. Weisman*, 803 F.2d 500, 504 (9th Cir.1986).

DEFENDANTS IGNITE AND ROHLEDER'S MOTION TO DISMISS COUNTS ONE THROUGH SIX OF THE INDICTMENT

beneficial ownership of more than 5% of the voting stock of the companies to the SEC (1988 Ind. ¶¶ 11-16, ¶¶ 25- 26, ¶¶ 29- 34, ¶¶ 48-49, ¶¶ 58-63, ¶¶ 66- 67, ¶¶ 68- 74); and

- thereby impermissibly delayed filing the disclosures for each company by a number of days (1988 Ind. ¶¶ 11-16; ¶¶ 25-26, ¶¶ 29-34, ¶¶ 58-63, ¶¶ 66-67, ¶¶ 68-74).

The jury convicted Bilzerian of violating these disclosure requirements. *See* Ex. 2, *United States v. Bilzerian*, No. 88-CR-00962-RJW-1 (S.D.N.Y.), Court Docket Entry, dated June 9, 1989 (no docket number provided); *see also* Ex. 3, Bilzerian Criminal Trial Transcript ("Crim. Trial Tr."), 3440-43, June 9, 1989, *United States v. Bilzerian*, 88-CR-00962-RJW-1 (S.D.N.Y. But the trial record contains no evidence of harm to any purported victim. To the contrary, the prosecutor expressly stated that the government was "*not required to prove any actual injury.*" *See* Ex. 4, Crim. Trial Tr., 1695, May 17, 1989 (emphasis added).

Following his conviction, Bilzerian was sentenced to four years in prison (later reduced to 20 months) and paid a $1.5 million criminal fine. *See Bilzerian*, 814 F. Supp. at 117. At sentencing, the government offered no argument as to victim losses. *See* Ex. 5, Government's Sentencing Memorandum, *United States v. Bilzerian*, No. 88-CR-00962-RJW-1 (S.D.N.Y. Sept. 27, 1989), Dkt. 45. And the judgment of conviction included no restitution order whatsoever. *See* Ex. 2, *United States v. Bilzerian*, No. 88-CR-00962-RJW-1 (S.D.N.Y Sept. 29, 1989), Dkt. 47.

In the wake of the criminal case, the SEC filed a civil action against Bilzerian seeking disgorgement of purportedly wrongful profits from the Cluett and Hammermill investments. *See* Ex. 6, Complaint at 74, *SEC v. Bilzerian*, No. 89-1854 (D.D.C. June 29, 1989) ("SEC Complaint"). The district court in the civil case granted partial summary judgment for the SEC, holding— without any independent analysis—that "since Bilzerian's [criminal] conviction was based on the same facts alleged by the Commission in support of certain of its claims with respect to these securities[,] Bilzerian is therefore collaterally estopped from relitigating the facts underlying his conviction." *SEC v. Bilzerian*, 1991 WL 83964, at *1 (D.D.C. 1991). The court then ordered Bilzerian to disgorge over $33 million. *See* SEC Judgment (*Bilzerian,* 814 F. Supp. at 124). In doing so, the court expressly rejected Bilzerian's argument that disgorgement must be tied to proof of harm, reasoning that "[d]isgorgement serves to force a defendant to relinquish the amount by which he was unjustly enriched *rather than to compensate the victims of fraud.*" *Id.* at 123 n.18

5

(emphasis added).  Accordingly, the district court's opinion makes no findings regarding victim harm.  It could not have done so in any event, because the judgment was based on collateral estoppel from the criminal case, which involved no evidence of victim harm, and the SEC introduced no evidence of harm.

The disgorgement award exceeded Bilzerian's net profits from the Cluett and Hammermill investments.  The court noted that Bilzerian returned half of the profits to his investors, yet it ordered him to disgorge the full amount of the profits.  *Compare Bilzerian*, 814 F. Supp. at 119 ("defendant repaid investors the full amounts of their loans plus a sum total of one-half the profits earned on the Cluett trades"), *with id.* at 123 ("the Court requires defendant to disgorge $4,821,124, *the total profits* gained from Cluett stock while in violation of the law") (emphasis added).  The same was true for the Hammermill trades.  *See id.* at 122-24.  As a result, the $33 million disgorgement award enormously exceeded Bilzerian's net profits from the investments.

**B.**      **Collection of the SEC Judgment Is Not a "Legitimate Official Function"**

**1.**      **Count One requires a conspiracy to defeat a legitimate official function.**

To charge a *Klein* conspiracy under 18 U.S.C. § 371, the government must allege a conspiracy to "defeat by misrepresentation [or] chicane" a "legitimate official action and purpose." *Hammerschmidt v. United States*, 265 U.S. 182, 188 (1924); *see* 18 U.S.C. § 371; *United States v. Rodman*, 776 F.3d 638, 642 (9th Cir. 2015) ("any conspiracy for the purpose of impairing, obstructing[,] or defeating the lawful function of any department of Government").

To avoid constitutional problems of vagueness and overbroad sweep, the Supreme Court and Ninth Circuit construe § 371 narrowly.  *United States v. Tuohey*, 867 F.2d 534, 537 (9th Cir. 1989).  This narrow construction requires that the "official action and purpose" or "function" at the heart of a *Klein* conspiracy charge be "legitimate" and "lawful."  *Hammerschmidt*, 265 U.S. at 188; *Tuohey*, 867 F.2d at 537.  Thus, the Ninth Circuit has explained that § 371 charges cannot be sustained where the alleged conspiracy related to a government purpose or function unsupported by the law.  *See, e.g., United States v. Murphy*, 809 F.2d 1427, 1430-32 (9th Cir. 1987) (invalidating indictment because conspiracy claims were based on filing of allegedly false currency reports that were actually correct); *United States v. Varbel*, 780 F.2d 758, 762-63 (9th Cir. 1986) (reversing

DEFENDANTS IGNITE AND ROHLEDER'S MOTION TO DISMISS COUNTS ONE
THROUGH SIX OF THE INDICTMENT

convictions because defendants only failed to report transactions outside the jurisdiction of the IRS, and thus those failures "could not have furthered a scheme to defraud the IRS").

In short, under binding precedent, Count One can only be valid if the government has a legitimate and lawful interest that could be affected by the alleged conspiracy.  Since Count One turns on the SEC Judgment, it must be dismissed if the SEC Judgment is invalid.

### 2.    The SEC Judgment violates the Double Jeopardy Clause.

The Constitution's Double Jeopardy Clause declares that no person shall "be subject for the same offence to be twice put in jeopardy of life or limb."  U.S. Const., amend. V.  In other words, once a person has stood trial for a crime, regardless of whether he is convicted or acquitted, the government cannot again pursue criminal charges against him for the same conduct.  Here, the 1993 SEC Judgment for $33 million, following on the heels of Bilzerian's criminal conviction, constituted an additional criminal punishment in violation of the Double Jeopardy Clause.  The collection of that judgment therefore cannot be a "legitimate official function" that Defendants could conspire to impede.

*First,* the SEC's disgorgement action against Bilzerian was nominally civil in nature. Despite that label, however, the judgment was unmoored from victim compensation and easily meets the Supreme Court's definition of a criminally punitive action.

The Supreme Court has long held that nominally "civil" punishments may implicate the protections of the Double Jeopardy Clause: "Even in those cases where the legislature has indicated an intention to establish a civil penalty, we have inquired further whether the statutory scheme was so punitive either in purpose or effect, as to transfor[m] what was clearly intended as a civil remedy into a criminal penalty."  *Hudson v. United States*, 522 U.S. 93, 99 (1997) (citation and quotations omitted).

*Hudson* explains how nominally civil consequences can nonetheless violate the constitutional prohibition on double jeopardy.  522 U.S. at 93.  The question is "whether the statutory scheme was so punitive either in purpose *or effect*, as to transfor[m] what was clearly intended as a civil remedy into a criminal penalty."  *Id.* at 99 (emphasis added) (citation and quotations omitted).  To make this assessment, courts consider seven factors:

7

DEFENDANTS IGNITE AND ROHLEDER'S MOTION TO DISMISS COUNTS ONE THROUGH SIX OF THE INDICTMENT

(1) "[w]hether the sanction involves an affirmative disability or restraint";

(2) "whether it has historically been regarded as a punishment";

(3) "whether it comes into play only on a finding of scienter";

(4) "whether its operation will promote the traditional aims of punishment-retribution and deterrence";

(5) "whether the behavior to which it applies is already a crime";

(6) "whether an alternative purpose to which it may rationally be connected is assignable for it"; and

(7) "whether it appears excessive in relation to the alternative purpose assigned."

*Id.* at 99-100 (quoting *Kennedy v. Mendoza–Martinez*, 372 U.S. 144, 168–169 (1963)).

These factors, taken together and in light of more recent Supreme Court rulings, make plain that the SEC Judgment against Bilzerian violates the Double Jeopardy Clause.

*Second,* the Supreme Court has recently made clear that SEC disgorgement awards are penalties and that they are invalid as punitive measures, rather than traditional civil remedies, unless they are tied to compensable harm to actual victims.  Two Supreme Court rulings subsequent to *Hudson* bear on the analysis of the SEC Judgment under *Hudson* and the Double Jeopardy Clause.  *See Kokesh v. SEC*, 581 U.S. 455 (2017); *Liu v. SEC*, 591 U.S. 71 (2020); *see also SEC v. Govil*, 86 F.4th 89, 98 (2d Cir. 2023) (abuse of discretion under *Liu* for district court to order disgorgement without determination that investors had suffered pecuniary harm).

In *Kokesh*, the Supreme Court first addressed whether an SEC disgorgement award is a "penalty" subject to the five-year statute of limitations in 28 U.S.C. § 2462.  The defendant was accused of misappropriating funds from investors from 1995 to 2009.  *See id*. at 459-60.  The district court imposed a $2.35 million civil monetary penalty for misappropriation that was limited to the 2004-2009 timeframe because of the statute of limitations, but then approved an SEC disgorgement award purportedly requiring the defendant to return *all* misappropriated funds from 1995 to 2009, because it concluded that the limitations period in § 2462 did not apply to SEC disgorgement awards.  *See id.*  The Supreme Court disagreed with a unanimous ruling, holding that SEC disgorgement awards are penalties for purposes of the § 2462 limitations period.

DEFENDANTS IGNITE AND ROHLEDER'S MOTION TO DISMISS COUNTS ONE THROUGH SIX OF THE INDICTMENT

The reasoning of *Kokesh* is instructive here. Notwithstanding its immediate focus on the limitations provision, *Kokesh* makes a number of unqualified statements about the essentially punitive nature of SEC disgorgement, including in contexts that apply directly to the *Hudson* analysis governing when the Double Jeopardy Clause applies to purportedly "civil" proceedings. *See, e.g.*, *id.* at 461 ("We hold that SEC disgorgement constitutes a penalty."); *id.* at 463 ("SEC disgorgement is imposed by the courts as a consequence for violating what we described in *Meeker* as public laws."); *id.* at 465 ("SEC disgorgement thus bears all the hallmarks of a penalty: It is imposed as a consequence of violating a public law and it is intended to deter, not to compensate.").

Indeed, the animating *reasoning* of *Kokesh*, though applied in the context of a specific statute, sweeps far more generally:

> A "penalty" is a "punishment, whether corporal or pecuniary, imposed and enforced by the State, for a crime or offen[s]e against its laws." *Huntington v. Attrill*, 146 U.S. 657, 667 (1892). This definition gives rise to two principles. First, whether a sanction represents a penalty turns in part on "whether the wrong sought to be redressed is a wrong to the public, or a wrong to the individual." *Id.*, at 668. Although statutes creating private causes of action against wrongdoers may appear—or even be labeled—penal, in many cases "neither the liability imposed nor the remedy given is strictly penal." *Id.*, at 667. This is because "[p]enal laws, strictly and properly, are those imposing punishment for an offense committed against the State." *Ibid.* Second, a pecuniary sanction operates as a penalty only if it is sought "for the purpose of punishment, and to deter others from offending in like manner"—*as opposed to compensating a victim for his loss*. *Id.*, at 668.

*Kokesh*, 581 U.S. at 461-62. (emphasis added). Applying these principles, the Supreme Court determined that SEC disgorgement is a "penalty" for purposes of the statutory limitations period.

The Supreme Court again addressed SEC disgorgement in *Liu v. SEC*, 591 U.S. 71 (2020). *Liu* holds that disgorgement penalties are permissible "equitable relief" under 15 U.S.C. § 78u(d)(5), but *only* to the extent the disgorgement award "does not exceed a wrongdoer's net profits and is awarded for victims . . ." *Id.* at 75; *see also id.* at 91. Similarly, *Liu* requires that trial courts sufficiently consider the extent to which an SEC disgorgement award serves the statutory purpose of §78u(d)(5), which limits equitable relief to that which "may be appropriate or necessary *for the benefit of investors*." *Liu*, 591 U.S. at 87, quoting § 78u(d)(5) (emphasis added). As *Liu* explains, a disgorgement award "must do more than simply benefit the public at large by virtue of

9

DEFENDANTS IGNITE AND ROHLEDER'S MOTION TO DISMISS COUNTS ONE THROUGH SIX OF THE INDICTMENT

1    depriving a wrongdoer of ill-gotten gains," because "[t]o hold otherwise would render meaningless

2    the latter part of § 78u(d)(5)." *Id.* at 89.

3    Under *Liu*, for a disgorgement to fall within the "equitable" scope of § 78u(d)(5), "courts

4    must deduct legitimate expenses before ordering disgorgement." *Id.* In drawing a distinction

5    between the traditional equitable scope and purpose of disgorgement (limited as noted above), on

6    the one hand, and punishment falling outside of both the statutory and traditional scope of such

7    equitable power, the Court observed the traditional distinction: "[T]he wrongdoer should not profit

8    'by his own wrong,' [but courts have] also recognized the countervailing equitable principle that

9    the wrongdoer should not be punished by 'pay[ing] more than a fair compensation to the person

10   wronged.'" *Id.* at 80 (quoting *Tilghman v. Proctor*, 125 U.S. 136, 145–146 (1888)).

11   Similarly, *Liu* makes clear that it is impermissible for a court to insist that disgorgement

12   awards need not consider victim compensation. *Compare Bilzerian*, 814 F. Supp. at 123 n.18, *with*

13   *Liu*, 591 U.S. at 88-89, and *Govil*, 867 F.4th at 98 (rejecting district court's disgorgement award as

14   abuse of discretion because SEC disgorgement "require[s] a showing that investors have been

15   harmed, and the court did not find that the SEC had made such a showing"). That, however, is

16   precisely how the SEC Judgment was imposed—without consideration of victim compensation and

17   untethered to any proof of actual harm. *See Bilzerian*, 814 F. Supp. at 123 n.18.

18   *Third,* disgorgement as practiced by the SEC in Paul Bilzerian's case is a penalty with all of

19   the hallmarks of *criminal* punishment.

20   As an initial matter, the fundamental presumption against finding that the Double Jeopardy

21   Clause's protection attaches to a sanction *described by Congress* as "civil" does not apply to the

22   SEC Judgment. The SEC Judgment was entered almost a decade before Congress amended the

23   Exchange Act to authorize the SEC to seek equitable relief and was thus wholly a judge-created

24   remedy. *See also Govil*, 86 F.4th at 99-100.[2]

25

26   _____

     [2] Whatever the implications of the mixed statutory and common law environment at issue in *Kokesh* and *Liu,*

27   that environment did not exist when the SEC Judgment was entered in 1993. As *Govil* explains, Congress
     did not amend the securities laws to authorize *any* form of equitable relief until 2002; disgorgement awards

28   entered before 2002 were based on courts' conclusions that their general equitable powers authorized
     disgorgement. *Govil*, 86 F.4th at 99-100.

DEFENDANTS IGNITE AND ROHLEDER'S MOTION TO DISMISS COUNTS ONE
THROUGH SIX OF THE INDICTMENT

These facts in themselves dictate that courts view pre-2002 disgorgement awards skeptically and without the deference owed to a *legislative* determination. This is all the more true where, as here, the disgorgement exceeds the traditional notions of equity that *Liu* requires for penalties under § 78u(d)(5). Bilzerian's SEC Judgment is disconnected from any remedial purpose and based on no finding of harm to any victim. The SEC Judgment is therefore a second criminal punishment in violation of the Double Jeopardy Clause.

The absence of any statutory authorization for the SEC Judgment eliminates both the "congressional intent" portion of the *Hudson* inquiry and any possible requirement that double jeopardy be demonstrated by "clearest proof." *See Hudson*, 522 U.S. at 94. Moreover, the seven *Hudson* factors uniformly support a double jeopardy finding here:

- ***Affirmative disability***. Removal of property is, at the very least, an "affirmative disability," especially where, as here, the judgment exceeded *Liu's* "net profits" boundary by several million dollars and was imposed with no proven harm to any victim.

- ***Historically regarded as a punishment***. Although monetary sanctions are not necessarily punitive, *Kokesh* answers this factor directly: "SEC disgorgement is imposed for punitive purposes." *Kokesh*, 581 U.S. at 464. Again, *Liu* underscores that this holding is particularly salient in cases where the SEC seeks disgorgement in amounts untied to victim compensation and a defendant's net gains. *See Liu*, 591 U.S. at 82-90. It is hard to imagine a scenario in which a court historically would have regarded a $33 million award as anything other than punitive when that award is disconnected from any proven harm.

- ***Finding of scienter***. Bilzerian's SEC Judgment was founded on a collateral estoppel theory derived from his *criminal* conviction. Moreover, of the nineteen Cluett- and Hammermill-related claims forming the basis for the SEC Judgment against Bilzerian, nine directly required proof of scienter. *See generally* Ex. 6, SEC Complaint. In addition, the SEC Complaint is littered with allegations that Bilzerian acted knowingly—even in the context of claims that do not facially require proof of scienter. *See generally* Ex. 6, SEC Complaint, Cluett Claims 1-5, Hammermill Claims 1-8. Criminal intent thus lay at the core of Bilzerian's first *and second* criminal punishments.

11

DEFENDANTS IGNITE AND ROHLEDER'S MOTION TO DISMISS COUNTS ONE
THROUGH SIX OF THE INDICTMENT

- ***Traditional aims of punishment-retribution and deterrence***.  Both *Kokesh* and *Liu* demonstrate that the overriding if not sole purpose of Bilzerian's second punishment was *further* punishment.  In the absence of victims or appropriate accounting for expenses, and in the presence of the pre-existing criminal sentence and fine, the sole interests promoted by the SEC Judgment are the traditional aims of criminal punishment.

- ***Already a crime.***  This factor is beyond dispute.  The SEC Judgment was merely a piling on of penalties for the same conduct charged as criminal conduct by the DOJ.

- ***Presence and proportionality of any alternative purposes***.  Again, the final two factors of the *Hudson* analysis, in light of *Kokesh* and *Liu*, confirm that the SEC Judgment was a criminal punishment.  Although the government may attempt to repackage the fundamentally punitive nature of disgorgement recognized by *Kokesh* in any number of "alternative" packages (*e.g.*, boosting investor confidence, increasing efficiency of markets), such repackaging inevitably returns to the basic purposes of disgorgement recognized by *Kokesh*: to punish, to deter, and, through the threat of such punishment, to accomplish underlying policy goals.  The notion of proportionality, moreover, further bolsters this conclusion in light of *Liu*.  Given that the SEC Judgment was not based on any showing of proportional harm to victims or other tailoring sufficient to meet the traditional *equitable* principles that allow for disgorgement in the civil context, the SEC Judgment has *no* relation to any alternative purpose that the government may invent.

As applied in Paul Bilzerian's over-thirty-year-old case, the SEC's disgorgement regime is punitive.  This is especially true where, as condemned by *Liu*, a disgorgement judgment is imposed without limitation to net profits and without any showing of compensable victim harm.

*Fourth,* in non-binding opinions from outside the Ninth Circuit, other courts have rejected facial challenges to SEC disgorgement awards on Double Jeopardy grounds even after *Kokesh*.  *See generally Bank*, 965 F.3d 287; *United States v. Dyer*, 908 F.3d 995 (6th Cir. 2018); *United States v. Jumper*, 74 F.4th 107 (3rd Cir. 2023).  The reasoning of these courts is unpersuasive in light of their treatment of *Kokesh* as solely concerned with the statute of limitations, when the reasoning of

DEFENDANTS IGNITE AND ROHLEDER'S MOTION TO DISMISS COUNTS ONE THROUGH SIX OF THE INDICTMENT

1    *Kokesh* is rooted in its assessment of disgorgement as a traditional penalty.  Indeed, *nothing* in

2    *Kokesh* suggests that its ruling hinges on the specific context of the statute of limitations.

3         Moreover, none of these cases grapples substantively with *Liu*, which takes an as-applied

4    approach to the assessment of a disgorgement award's validity.  Here, as in *Liu*, the massive

5    disconnect between the penalty imposed and the valid non-punitive bases for equitable

6    disgorgement only further establishes that the SEC Judgment violated the Double Jeopardy Clause.

7    As discussed above, although Bilzerian did profit from his Cluett and Hammermill investments, no

8    tribunal or proceeding has ever found that any victim was harmed by the conduct resulting in either

9    his criminal conviction or the SEC Judgment.  The $33 million judgment—now swollen to over

10   $180 million with pre- and post-judgment interest—is unconstitutionally punitive on that basis

11   alone.  Moreover, the SEC Judgment is not limited to Bilzerian's *net* profits, which is further proof

12   that the amount of the award is wildly disproportionate to any non-punitive purpose.

13                              *       *       *

14        In sum, the SEC Judgment was a second punishment, criminal in nature if not in name, for

15   the conduct already punished in the DOJ criminal case.  The SEC Judgment thus violates the

16   Double Jeopardy Clause.  Because the SEC Judgment is unmoored from the principles set forth in

17   *Liu*, it is also invalid for that reason, as well.  *See* 591 U.S. 71 (2020); *Govil*, 86 F.4th 89.  In either

18   case, that invalid judgment cannot form the basis for any underlying legitimate government interest

19   as to which a *Klein* conspiracy can be proved.  Count One must therefore be dismissed.

20        **C.    The Indictment Does Not Allege That Ignite and Rohleder Were Even *Aware* of the SEC's Purported Collection Efforts, Much Less That They Conspired to *Impede* Them**

21

22        The SEC tried repeatedly to draw blood from a stone, ignoring Bilzerian's attestations

23   regarding his lack of assets.  For a time, the SEC persisted in its efforts using standard mechanisms

24   for recovery.  The SEC sought and received the appointment of a receiver to collect funds in

25   satisfaction of its (illegal) disgorgement judgment.  A receiver works as an officer of the court to

26   recover assets obtained by a defendant in connection with an alleged securities violation.

27        As to Bilzerian, the district court in the SEC case appointed a Receiver and established a

28   Receivership Estate "for the purpose of identifying, marshalling, receiving and liquidating

                                                      13

1   [Bilzerian's] assets to satisfy the disgorgement judgments." *SEC v. Bilzerian*, 127 F. Supp. 2d 232,

2   232 (D.D.C. 2000). The court further ordered that the Receiver have "exclusive control" of all of

3   Bilzerian's accounts and for Bilzerian and his agents to "give access to [any] assets, books, records

4   or other property to the Receiver." *See* Ex. 7, Amended Order at 3-4, *SEC v. Bilzerian*, No. 89-cv-

5   1854-RCL (D.D.C. Mar. 1, 2001), Dkt. 210. For fourteen years, the Receiver investigated the

6   entities identified by the court as recipients of Bilzerian's funds and liquidated the assets she was

7   able to locate. *See* Ex. 8, Receivership Rept., No. 89-cv-1854-RCL (D.D.C. Nov. 13, 2015), Dkt.

8   1200-1.

9   In 2015, the Receiver moved to terminate the receivership. Bilzerian "objected to the relief

10  requested [by the Receiver's motion and proposed order] only to the extent it provided for the

11  continuation of the disgorgement judgments entered against him." *See* Ex. 8, Receiver's Mot. at 2,

12  No. 89-cv-1854-RCL (D.D.C. Nov. 13, 2015), Dkt. 1200. The court granted the Receiver's Motion

13  "in its entirety," terminated the receivership, and ordered that "[t]he disgorgement judgments

14  previously entered against Mr. Bilzerian in this case shall remain in full force and effect." *See* Ex.

15  9, Final Order at 1-2, No. 89-cv-1854-RCL (D.D.C. Jan. 28, 2016), Dkt. 1201.

16  Nearly a decade after the receivership was terminated, DOJ brought criminal charges

17  against Bilzerian, Ignite, and Rohleder, based on the theory that the three conspired to defraud the

18  United States "by impeding, impairing, obstructing, and defeating the lawful government functions

19  of the SEC with respect to collection of the SEC Judgment by deceitful and dishonest means."

20  Indictment ¶ B.2, Dkt. 1.

21  Notably, this allegation sets the beginning of the "conspiracy" in which Ignite was

22  purportedly involved in 2018—two years after the SEC ceased its apparent efforts to collect on

23  Bilzerian's disgorgement judgment. Not a single allegation involving Ignite involves a statement

24  to or act directed at (or conceivably intended to affect) the SEC. Indeed, not a single allegation

25  against Ignite describes *any* deceitful, unlawful, or even disruptive action by Ignite as to the SEC's

26  efforts (if they still existed) to collect against Bilzerian. Rather, *every* act involving Ignite, as set

27  forth in the Indictment, is simply a description of Ignite receiving funds from an entity that the

28  government claims (incorrectly) was funded and owned by Bilzerian. Even ignoring the factual

14

DEFENDANTS IGNITE AND ROHLEDER'S MOTION TO DISMISS COUNTS ONE
THROUGH SIX OF THE INDICTMENT

1    error as to Bilzerian's funding of International Investments, the Indictment simply fails to describe

2    a crime: Ignite did not and could not have impeded the SEC's collection efforts merely by

3    receiving money that a third party would be required to pay to the SEC if ordered.

4         The Indictment's insufficient pleading is set in stark relief against the backdrop of the

5    SEC's actual collection efforts (or lack thereof during the relevant period).  The SEC adopted its

6    debt collection rules in 1993 in accordance with then-existing provisions of the Debt Collection

7    Act, the Federal Claims Collection Standards ("FCCS"), and other authorities governing the

8    collection of federal debts.[3]  In 1996, Congress passed the Debt Collection Improvement Act

9    ("DCIA"), tasking Treasury with certain government-wide debt collection responsibilities.  Among

10   other things, the law provides that delinquent non-tax debts must be turned over to Treasury for

11   appropriate action to collect the debt.[4]  After DCIA was passed, the SEC entered into an agreement

12   with Treasury's Bureau of Fiscal Service's Disbursing and Debt Management, pursuant to which

13   the SEC transfers outstanding debt to the Bureau for collection.[5]  In November 2000, Treasury and

14   DOJ adopted a new version of the FCCS governing the collection of federal debts generally.[6]  In

15   November 2001, as a result of the promulgation of the new FCCS rules and other new rules enacted

16   after the DCIA, the SEC updated its existing rules for debt collection.[7]  The Bureau manages

17   Cross-Servicing Programs for delinquent debt collection.  The Cross-Servicing Program has a

18   number of tools it can use for debt collection, including sending demand letters, negotiating

19   payment agreements, reporting debts to credit bureaus, referring debts to private collection

20   agencies, offsetting federal and state payments through the Treasury Offset Program, and assisting

21

22

---

23   [3] 17 C.F.R. Part 204; *see also* SEC, *Certifications & Exemptions, Under the Int'l Reguls. for Preventing Collisions at Sea, 1972*; *Amend.*, 66 Fed. Reg. 56, 383 (Nov. 7, 2001) (codified in 17 C.F.R. 204),

24   https://www.sec.gov/rules-regulations/self-regulatory-organization-rulemaking/sr-nscc-2001-14#P16_1304.

25   [4] *See* Omnibus Consolidated Rescissions & Appropriations Act of 1996, Pub. L. No. 104-134, § 31001, 110 Stat. 1321-358 *et seq*. (1996); *see also* 31 U.S.C. § 3716(c).

26   [5] *See* SEC, *Certifications & Exemptions, Under the Int'l Reguls. for Preventing Collisions at Sea, 1972*; *Amend.*, 66 Fed. Reg. 56, 383 (Nov. 7, 2001) (codified in 17 C.F.R. 204), https://www.sec.gov/rules-

27   regulations/self-regulatory-organization-rulemaking/sr-nscc-2001-14#P16_1305.

     [6] *See* 65 Fed. Reg. 70, 390 (Nov. 22, 2000) (adopting 31 CFR C.F.R. Parts 900 through 904).

28   [7] *See* 17 C.F.R. Part 204.

---

DEFENDANTS IGNITE AND ROHLEDER'S MOTION TO DISMISS COUNTS ONE THROUGH SIX OF THE INDICTMENT

1  with the resolution of disputes about the amount or existence of the debt.[8]  Each of these methods,

2  if undertaken, would require or result in the debtor being notified of ongoing collection efforts.  But

3  none is alleged to have been noticed to Ignite.

4      Absent any allegation of ongoing efforts by the SEC—let alone efforts *of which Ignite and*

5  *Rohleder were aware*—the Indictment fails to allege any unlawful act or any lawful government

6  function.  A *Klein* conspiracy under § 371 requires the government to allege and eventually prove

7  that a defendant (1) entered into an agreement (2) to obstruct a lawful function of the government

8  (3) by deceitful or dishonest means and (4) committed least one overt act in furtherance of the

9  conspiracy.  *See Hammerschmidt*, 265 U.S. at 188; *United States v. Boone*, 951 F.2d 1526, 1543

10  (9th Cir.1991).  While the "unlawful means" need not be a fully choate crime, those means must be

11  nevertheless alleged and proven to aim to obstruct lawful function(s) of the government through, at

12  least, "dishonest" means.  It is sufficient for § 371 that "the conspiracy aims to obstruct the lawful

13  functions of a government agency through some form of 'deceit, craft or trickery, or at least by

14  means that are dishonest.'"  *United States v. Concord Mgmt. & Consulting LLC*, 347 F.Supp.3d 38,

15  46 (D.D.C. 2018) (quoting *Hammerschmidt*).

16      In this instance, *every* act allegedly undertaken by Ignite relates simply to the receipt or use

17  of funds; the Indictment makes *no* allegation that Ignite undertook any of those actions for the

18  purpose of interfering in the SEC's collection efforts.

19      The Ninth Circuit's decision in *United States v. Krasovich* is on point:

20      In this case, there may well have been ample evidence that Andrea Drummond intended to
21      use Krasovich to hide true ownership of property in order to evade income taxes. There is,
        however, no basis on which a reasonable jury could conclude that the defendant Krasovich
        had the same objective with respect to the transaction alleged in Count Eight. Nothing in the
22      circumstances of the transaction suggests that Krasovich knew that the purpose of the
        concealment was to evade taxes.

23  819 F.2d 253, 256 (9th Cir. 1987); *see also id.* ("This ruling comports with the general principle

24  that although a defendant may be found guilty of conspiracy even if he did not know all of the

25  details of the scheme, the evidence must demonstrate that he knew the conspiracy's essential

26  objectives." (citing *Blumenthal v. United States*, 332 U.S. 539, 554–57 (1947))); *United States v.*

27

28  ――――――――――――――――――
[8] *See* U.S. Dep't of Treasury, *Cross-Servicing*, https://fiscal.treasury.gov/cross-servicing/index.html (last
visited March 6, 2025).

DEFENDANTS IGNITE AND ROHLEDER'S MOTION TO DISMISS COUNTS ONE
THROUGH SIX OF THE INDICTMENT

1   *Mendez*, 528 F.3d 811, 815–16 (11th Cir. 2008) ("The facts to which the parties stipulated do not

2   show that Mendez even knew the federal government was involved in the issuance of Florida

3   CDLs, let alone that the United States was the ultimate intended target of Mendez's conduct.

4   Accordingly, … there was no basis for the district court to find that Mendez was guilty beyond a

5   reasonable doubt of defrauding the United States under 18 U.S.C. § 371.").

6        Given the SEC's collection practices and the history of its efforts as to Bilzerian, the

7   Indictment describes a scenario in which Ignite and Rohleder would have no reason to know of any

8   SEC collection efforts.  This case is akin to similarly failed charges where the government *would*

9   *like* for a third party to act as its deputy, but where no such duty to investigate or report on benign

10  activity exists.

11       For example, in *Varbel*, 780 F.2d 758, the Ninth Circuit overturned a § 371 conviction of

12  defendants allegedly engaged in laundering money derived from drug trafficking, and who were

13  identified as depositing large amounts of currency into U.S. banks.  The defendants allegedly

14  "structured" their transactions, opting to send multiple transactions all below $10,000 so as to avoid

15  the banks filing currency transaction reports ("CTRs").  However, because the CTR was not

16  required to be filed in those instances, and because "the Reporting Act and its regulations did not

17  impose a duty on appellants to inform the banks involved of the nature of their currency

18  transaction," the Court found it would violate due process to impose criminal liability based on

19  those transactions.  *Id.* at 762; *see also id.* ("Since the appellants have not illegally concealed

20  matter within the jurisdiction of the IRS, the wire transfer of funds from the Cayman Islands to

21  Phoenix could not have furthered a scheme to defraud the IRS [in violation of 18 U.S.C. § 1343].").

22       Similarly, in *Murphy*, 809 F.2d 1427, the government alleged the defendants violated § 371

23  by depositing large amounts of currency into U.S. banks.  In *Murphy*, the defendants *did* deposit

24  more than $10,000 and in fact filled out the CTR.  Because the CTR was truthful, precisely because

25  "the regulations implementing the Act do not impose a duty to disclose information [i.e. the source

26  of the funds]," the court held that the "failure" to disclose had not constituted a conspiracy to

27  defraud the government.  *Id.* at 1431-32.

28

---

17

**DEFENDANTS IGNITE AND ROHLEDER'S MOTION TO DISMISS COUNTS ONE THROUGH SIX OF THE INDICTMENT**

In this case, there similarly is no "failure" to disclose information.  For one thing, there is no allegation that Ignite or Rohleder *had* allegedly relevant information.  And, additionally, there is no obligation for Ignite, Rohleder, or anyone else to volunteer services in support of the SEC's moribund collection efforts.  "A failure to disclose information can only be deceptive—and thus serve as the basis for a § 371 violation—if there is a legal duty to disclose the information in the first place."  *Concord Management*, 347 F. Supp. 3d at 48 (citing *Murphy*).  The Indictment does not describe any such legal duty, nor did one exist.  Moreover, the Indictment fails to allege facts that could plausibly be read to suggest that Ignite *could have* understood that the SEC's disgorgement efforts continued during the time of the Indictment—all relevant statements directed to any U.S. agency during the time of the charged conduct are allegedly by *Bilzerian* alone.

*       *       *

It is not a legitimate function of the SEC to sit back and wait for third parties to volunteer information about the SEC's longtime targets.  Indeed, by 2018, there was not even an obligation on Bilzerian to report any purported beneficial ownership or funding of Ignite, International Investments, or any other entity.  In short, the Indictment describes neither an unlawful act by Ignite or Rohleder nor a lawful function of the SEC during the relevant timeframe.  For these reasons, too, Count One must be dismissed.

## II.    COUNTS TWO THROUGH SIX MUST BE DISMISSED

Counts Two through Six (the 3PL Counts) allege that Ignite conspired with others to create a series of purportedly fake sales to one of Ignite's distributors ("Company 1") in an effort to falsely inflate Ignite's reported revenue.  The government's allegations are predicated on a fundamental misunderstanding of Ignite's relationship with its master distributor and a misleading and self-serving interview with Company 1's then-owner.  Ignite has presented to the government regarding these factual errors and, following its own post-indictment investigation, the government now has specific knowledge and evidence objectively demonstrating that the 3PL Counts are factually baseless.

DEFENDANTS IGNITE AND ROHLEDER'S MOTION TO DISMISS COUNTS ONE
THROUGH SIX OF THE INDICTMENT

*First,* as Ignite has explained to the government, Company 1 was Ignite's "master distributor"—a role that Company 1 had obtained by aggressively lobbying Ignite just months before the invoices in question.

A master distributor stands between a company (*i.e.*, a manufacturer, or an importer like Ignite) and smaller distributors that sell to retailers. A manufacturer might agree to have a master distributor if the company values having just one seller to deal with, rather than dealing directly with numerous regional distributors. But the price that the regional distributors are willing to pay is set by market forces of supply and demand, meaning that the master distributor cannot charge them any more than the manufacturer itself was charging them before it had a master distributor. Therefore, if the relationship is to make sense (that is, to be profitable) for the master distributor, the manufacturer must be willing to sell to the master distributor at a price lower than the market price that ordinary distributors are willing to pay, to enable the master distributor to turn a profit when it sells the products on to the ordinary distributors at the market price. And, for *that* to make sense for the manufacturer, the master distributor must actually perform the role of master distributor by buying in bulk as a single point of sale for the manufacturer and taking responsibility for selling the products on to other distributors. Otherwise, the manufacturer would sell directly to those other distributors at the market price rather than selling at a discount to the master distributor.

At times, Company 1 had acted as a third-party logistics provider ("3PL") for Ignite rather than a master distributor. The role of a 3PL is to warehouse bulk products owned by a seller (e.g., a manufacturer or distributor) and then package and ship those products to buyers. In this arrangement, the seller makes the sales to the buyers. Unlike a distributor, a 3PL never takes ownership of the products, never sells them, and never earns any profit margin. It simply provides a service to the seller for a service fee.

While a distributor could contract with a 3PL, a distributor might well prefer to perform those warehousing and shipping roles itself, to save on the cost of a 3PL. It is therefore natural for a single company to act both as a distributor of certain products and as a 3PL for other sellers and other products since it can use the same warehousing and shipping capacity for both roles.

19

DEFENDANTS IGNITE AND ROHLEDER'S MOTION TO DISMISS COUNTS ONE
THROUGH SIX OF THE INDICTMENT

*Second,* in September 2020, after Company 1 had begun to purchase Ignite products, its president came to Ignite asking to become Ignite's master distributor. Company 1 proposed that it would buy a certain vape product from Ignite at a low unit price of $5.50 and have distribution control of the Southwestern territories. Ignite agreed to the proposal, and it credited Company 1 for existing purchases made at the standard $5.98 price, retroactively reducing the price to $5.50.

Consistent with the new master distributor arrangement, Ignite began placing larger orders from its Chinese supplier *based on what Company 1 represented it could sell*. Of course, if Company 1 had been acting merely as a 3PL, Ignite would have made the purchasing decisions itself, without Company 1's input. Moreover, as a master distributor, the product delivered by Ignite to Company 1 pursuant to this arrangement was *purchased* by Company 1, not merely warehoused on behalf of Ignite. Further sale of that product was to Company 1's customers, who would pay Company 1—not, as would be the case in a 3PL relationship, to Ignite's customers.

*Third,* the government accuses Ignite of falsely recognizing revenue from sales to Company 1 in connection with three invoices in November and December 2020 despite allegedly knowing that Company 1 had not ordered the invoiced product. Although product was undisputedly delivered to and stored at Company 1's warehouse, Company 1 apparently represented to the government that Company 1 was just acting in a 3PL capacity, not purchasing the at-issue product itself. But the government is incorrect—and Company 1 was just lying to avoid a payment obligation that it knowingly incurred. Company 1 *had* purchased the product covered by the invoices, consistent with its voluntary role as master distributor for that very product. Today, the government knows that Company 1 is lying. Yet it persists with the 3PL Counts and has failed to provide *Brady* material relating to Company 1's misrepresentations.

In late December 2020, two other distributors sought to become master distributors for the same Ignite products that Company 1 was distributing. Ignite made clear to them that the role would require an initial order of 500,000 units at $5.75 per unit. Both companies were interested in that arrangement, but Ignite was clear that any additional master distributor would have to work harmoniously with Company 1. Ignite raised the possibility of a second master distributor with Company 1, however, and Company 1—in an attempt to safeguard its exclusive position—stepped

20

DEFENDANTS IGNITE AND ROHLEDER'S MOTION TO DISMISS COUNTS ONE THROUGH SIX OF THE INDICTMENT

up to purchase an additional 500,000 units. Ignite invoiced Company 1 for that purchase (the third invoice that Company 1 now falsely claims was fraudulent) but gave it 30-40 days to pay. The purchase itself occurred in late December 2020.

On January 13, 2021, Company 1 again tried to evade its *payment* obligation. Ignite responded by making clear that the order was completed in December, though it also suggested that it would work with Company 1 as long as it made regular weekly payments. In short, Ignite insisted, correctly, that Company 1 was responsible for all of the invoices and believed that it had resolved the issue by holding Company 1 responsible for the overall balance that it owed but allowing Company 1 to pay off its balance in installments over several weeks. Critically, none of Company 1's dissembling on *payment* undermined Ignite's correct understanding that Company 1 had purchased the relevant product in late December 2020.

This was the understanding, undisputed by Company 1, when Ignite announced its unaudited results for the fourth quarter of 2020 on January 19, 2021. It is therefore plain that the announcement was not fraudulent when made. It was not even erroneous. Again, the government now knows this to be the case, but has yet to dismiss the 3PL Counts.

On January 26, Ignite sent Company 1's president a draft audit letter confirming the amounts due under the invoices that the government now claims were fraudulent. The next day, Company 1's president replied with a signed copy of the letter. Ignite then sent the letter to its auditors, who approved its language and sent it to Company 1's president for his signature. On January 28, however, Company 1 held a call with Ignite on which its president said that he would *not* sign the letter (the same letter that he had in fact signed the day before). At this point, it became clear to Ignite that Company 1 was simply acting in bad faith. Ignite responded that another company, International Investments, would step in and retroactively pay for the inventory. Once again, Ignite's statements regarding its inventory and 2020 sales were accurate, as the government now knows.

*Fourth,* through a series of presentations that have gone unrebutted by the government, Ignite has painstakingly demonstrated that the 3PL Counts are fatally flawed, being based on false information from Company 1 and a misunderstanding of the documents produced by Ignite and

21

DEFENDANTS IGNITE AND ROHLEDER'S MOTION TO DISMISS COUNTS ONE THROUGH SIX OF THE INDICTMENT

others.  The same principles that condemn a prosecutor's presentation of false and misleading evidence prior to indictment require that, where the prosecutors *know* that a count is grounded on false information, that count must not be presented at trial.  *Cf. Wood v. Georgia*, 370 U.S. 375, 390 (1962) (grand jury's role is to "stand[] between the accuser and the accused" and protect the innocent against "hasty, malicious and oppressive persecution"); *Stirone v. United States*, 361 U.S. 212, 218 (1960) (grand jury's purpose is to limit defendants' jeopardy to charges approved by a body "acting independently of either prosecuting attorney or judge"); *Ex parte Bain*, 121 U.S. 1, 11 (1887) (grand jury is "means of protecting the citizen against unfounded accusation").

Relatedly, now that the government is aware that the information provided by Company 1 and its representatives was false and intended to mislead, the government should recognize that *all statements and material* relating to Company 1—and particularly all communications and statements made by or on behalf of Company 1 that the government may previously have credited as true and, thus, not exculpatory—are now subject to disclosure under *Brady v. Maryland*, 373 U.S. 83, 87 (1963).  This includes all information provided by Company 1 or its representatives in the time since Ignite's fulsome presentation to the government regarding Company 1's falsities reflected in the 3PL Counts.  The government is now actively suppressing "evidence favorable to an accused," and that suppression "violates due process [as] the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."  *Id.* at 87.  That suppression should cease immediately, as should the government's baseless persistence in prosecuting the 3PL Counts.

DEFENDANTS IGNITE AND ROHLEDER'S MOTION TO DISMISS COUNTS ONE THROUGH SIX OF THE INDICTMENT

1

**CONCLUSION**

2

The Court should dismiss Counts One through Six of the Indictment.

3

Dated: March 11, 2025                    Respectfully submitted,

4

**STEPTOE LLP**

5

6

/s/ Ashwin J. Ram
Ashwin J. Ram
Sonja Arndt-Johnson

7

8

*Attorneys for Defendant Ignite*

9

**BIENERT KATZMAN LITTRELL
WILLIAMS LLP**

10

11

12

/s/ Reuben C. Cahn
Reuben C. Cahn

13

14

*Attorney for Defendant Scott Rohleder*

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DEFENDANTS IGNITE AND ROHLEDER'S MOTION TO DISMISS COUNTS ONE
THROUGH SIX OF THE INDICTMENT